**UNITED STATES EASTERN DISTRICT COURT FOR THE STATE OF LOUISIANA**

**CASE NO:**                                                                      **DIVISION:**

**NICHOLAS A. HARPER**

**VERSUS**

**THE CITY OF COVINGTON POLICE DEPARTMENT,
STEVEN SHORT both individually and in his official capacity, STEVEN CULLOTTA
both individually and in his official capacity, AND THE DISTRICT ATTORNEYS
OFFICE FOR THE PARISH OF ST. TAMMANY STATE OF LOUISIANA**

**************************************************************************

**PLAINTIFF'S EMERGENCY ORIGINAL VERIFIED PETITION AND
APPLICATION/MOTION FOR TEMPORARY INJUNCTION, AND PRELIMINARY,
INJUNCTION AND/OR MOTION FOR STAY OF PROCEEDINGS PENDING
HEARING**

**NICHOLAS A. HARPER**, herein after referred to as **PETITIONER** by and

through undersigned counsel, hereby institutes the instant suit temporary and ultimately

preliminary injunctive relief against the named Respondents as follows:

**I.    PARTIES**

1.         Petitioner, Nicholas A. Harper, who is a person of the full age of majority and
domiciled   and residing in the City of Baton Rouge, State of Louisiana; and who
formally was employed by the Covington Police Department as a patrol officer.

2.         Respondent, The City of Covington Police Department is a municipal department
within the supervision and control of the City of Covington and the Mayor of the
City of Covington. Further, upon information and belief the City of Covington and/or
the Mayor for the City of Covington at all relevant times reposed, delegated,
entrusted whether pursuant to agency principles or other otherwise  in its Chief of
Police for the City of   Covington Police Department final authority as to matters
investigated by the police.

3.         Respondent, Steven Short, individually and in his official capacity, as a police officer
for the City of Covington Police Department having been at formally at all applicable
times the Lieutenant solely in charge of Internal Affairs investigations. Steven Short
is and at all relevant times was acting as the the Internal Affairs Investigator for the
City of Covington Police Department prior to his recent removal from that position
and was at all relevant  times acting in the course and scope of his employment and

1

official duties and at all times was acting under color of state law. Further, Steven Short to the best of information belief is a resident and domiciliary of the Eastern District of Louisiana.

4.      Respondent, Steven Cullotta, individually and in his official capacity, as a police officer for the City of Covington Police Department who was previously  prior to recent transfer to street patrol the officer was the head detective of the police departments Criminal   Investigation Unit. Steven Cullotta was at all relevant times was acting as a detective for the City of Covington Police Department and was at all relevant times acting in the course and scope of his employment and official duties and at all relevant times was acting under color of state law. Further, Steven Cullotta to the best of information and is a resident and domiciliary of the Eastern District of Louisiana.

5.      Respondent, St. Tammany District Attorney's Office a municipal department within the supervision and control of the State of Louisiana including its officers, agents and assigns District Attorney Walter P. Reed, and any Assistant District Attorney employed by his office. The St. Tammany Parish District Attorney's Office, and Walter P. Reed, and his offices agents and assigns are domiciled in the Eastern District of Louisiana.

## II.     JURISDICTION AND VENUE

6.      Jurisdiction is vested in this Honorable Court pursuant to 28 U.S.C. Section 1331 and 42 U.S.C. section 1983 and the United States Constitution because this case arises under the Constitution and laws of the United States. Thus the instant suit is an actual controversy arising under the Fifth and Fourteenth Amendments of the United States Constitution and  arises pursuant to the provisions of Title 42 U.S.C. sections 1983 and 1988 respectively.  And Jurisdiction is also vested and proper being in with the Anti-Injunction Act codified as 28 U.S.C Section 2283,being expressly authorized by acts of congress as injunctions of pending state proceedings under section 1983 are "expressly authorized" *Mitchum v. Foster*, 407 U.S. 225 (1972).

7.      Supplemental jurisdiction is also asserted for all claims cognizable under the laws of the State of Louisiana and the Louisiana State Constitution including claims for violations of I, section 2, all pursuant to 28 U.S.C. section 1367.

8.      Venue is proper in this District Court under 28 U.S.C. Sections 1391(b) and 1393(a). Plaintiff avers that one or more of the defendants reside in this district and the claims  herein arose in this district.

**III.    PRELIMINARY STATEMENT AND CAUSES OF ACTION**

This action seeks that a emergency temporary injunction issue and ultimately that such be sustained as a preliminary injunction to the enjoin certain state actors from proceeding under the color of law with the underlying criminal prosecution of former Officer, Nicholas A. Harper. Intervention of the federal court is necessary and warranted to cease bad faith prosecution impermissibly motivated by personal and political agenda with a desire to discipline, or retaliate against, intimidate, coerce and place undue influence not only Petitioner herein but upon state and defense witnesses in the underlying matter to effectively infringe upon guaranteed First Amendment rights implicating the greater right to due process protections. These federal rights and in particular due process secured by the Constitution which Petitioner has been deprived of through the chilling of speech and due process are further infringed upon by the bad faith prosecution of certain state actors committed under the authority and color of law thereby subverting their duties through bad faith tactics of intimidation, coercion, and duress within the investigation and through their bad faith tendering and withholding of relevant information, statements from the grand jury to effectively taint its independent judgment in attaining the desired pre-determined result.

9.) This Civil Action for Injunction is brought pursuant to Title 42 U.S.C. Section 1983 and 1988 as an action to redress the wrongful, malicious, and intentional deprivation under color of law, statute, ordinance, regulation, custom or usage of the rights and privileges or immunities secured to Petitioner by the Constitution of the United States, including but not limited to the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution and/or by acts of Congress. Petitioner further asserts claims pursuant to the Constitution of the State of Louisiana,

3

and other pertinent statutes, laws, and ordinances of the State of Louisiana, and also brought pursuant to United States Code Section 1985 (2) as it is unlawful for two or more to conspire for the purpose of impeding, hindering, obstructing or defeating in any manner the due course of justice in any State matter with intent to any citizen the equal protection of the laws.

10.)       Petitioner, former Police Officer Nicholas A, Harper, seeks that the court issue a temporary injunction ultimately maintaining such as a preliminary injunction to prohibit and enjoin certain state actors from the bad faith prosecution of the underlying matter; which state actors if not enjoined from proceeding presents a situation in which plaintiff will suffer irreparable injury unless equity intervenes and the instant temporary injunction issues forthright as there exist no adequate remedy at law which would prevent and/or undo Petitioner's irreparable injury and deprivation of constitutionally secured rights due to the state actors' bad faith, harassment, intimidation, fear of retaliation and ultimately the chilling of protected speech, as respondents in a self policing fashion have utilize the judicial system and their positions of authority impermissible by acting as instruments of persecution in bad faith against petitioner and witnesses in frustration, denial and curtail of those rights.

11.) Petitioner avers that an immediate temporary restraining order should issue as (1) Petitioner has a substantial likelihood of success on the merits for a preliminary injunction to be sustained; (2) there also exist a substantial threat that failure to grant the injunction will result in a irreparable injury to petitioner; (3) that the direct injury outweighs any potential damage that the injunction may cause the opposing party; and (4)  that the injunction will not to diserve the public interest.

**IV.   FACTUAL ALLEGATIONS**

**12.**         Petitioner, Nicholas A. Harper, who held a permanent classified civil service position

with the City of Covington Police Department as a police officer was intentionally targeted  by

state municipal actors within the City of Covington Police Department for an impermissible

agenda with Petitioner having been initially investigated by the Department's former Internal

Affairs Lieutenant, Steven Short, and thereafter criminally investigated by the Department's

Criminal Investigations Unit, by former Detective Steven Cullatta, and former Detective, Bart

Oweny, [with all 3 investigator having recently been re-assigned and/or transferred in connection

with ongoing independent IA investigations for alleged conduct and activities arising out of their

Investigatory positions]. The actions taken against former Officer Harper were calculated  to

bring about the predetermined result of Officer Harper having been arrested on March 25, 2013;

for an incident in the line of duty occurring on November 20, 2012; with Petitioner thereafter

being terminated on April 24, 2013, by Chief Palmisano and subsequently indited for the

misdemeanor charge of simple battery on June 10, 2013.

**UNDERLYING CRIMINAL MATTER**:

13.)  The misdemeanor criminal trial entitled State of Louisiana v. Nicholas Harper, Docket #

534231 Division "C", 22nd JDC State of Louisiana against Plaintiff **is set to commence June 3,**

**2014,** with the matter having been continued four times by the State. Thus, Petitioner seeks an

emergency temporary injunction issue as defense and state witnesses who are currently

employed as Officers with the Covington Police Department have recently been effectively

silenced  through fear of retaliation and/or discipline if they don't stand behind the "Departments

Position" and/or if they associate, communicate or otherwise with Petitioner.  Therefore, the

right to testify  truthfully without of fear of retaliation, being disciplined and/or targeted down

5

the line gravely infringes on Petitioner's constitutional rights.

**BRIEF FACTUALSUMMARY GIVING RISE TO CRIMINAL MATTER**

14.) The incident of November 20 2012, giving rise to the underlying criminal proceeding

commenced when George Davis, a known past offender was arrested at a local supermarket for

battery upon the store owner after committing theft of the store. Davis who was also intoxicated

was taken to be booked at Covington Police Department. He was placed in a holding cell in the

departments small booking room. Davis while in the holding cell prior to the incident occurring

was yelling and screaming various threats and obscenities. During this time, Plaintiff, Officer

Harper was seated in the booking room at the computer completing paper work.

15.) Plaintiff, Harper had no intention to go into the holding cell despite Davis' request that he do

so due to Davis' obvious state of condition presenting a clear danger to Harper, as detailed in the

video footage when Harper informs Davis that he is not going to open the booking cage at that

time and likewise informing Davis that the video cameras were on. As Harper sat completing his

paperwork, the next shift was starting to come on, and without warning Officer Anthony Adams

at his own discretion entered the booking room and proceeded to enter the booking cage where

an hostile and agitated Davis was held as cane be seen on the booking room video footage. Upon

Officer Adams entering the cage, a struggle ensued. Ultimately, Officer Adams was bitten

causing the officer to bleed. Davis after battering Officer Adams, informed that he was infected

with the deadly infectious AIDS virus and that now the Officer Adams had it too.

16.)  This scenario caused Petitioner, Harper to respond to assist Adams who had just been

attached and potentially infected with a deadly virus. Initially Plaintiff had his pepper spray in

hand, but was ordered his commanding officer, Lt. Beach not to utilize the OTC spray as he

would end up contaminating everyone one in the room due to its extremely small size. Therefore, Lt. Beach ordered Petitioner to tase Davis if he continued to resist. Davis continued to resist, be combative and present threat to Officer Harper who was forced to enter the cage after Officer Adams was battered. Davis' resistance did not remit despite Harper's clear verbal commands and therefore Lt. Beach ordered Davis to be tased again. The extremely small booking room with the became filled with personnel including other police officers and medical personnel whom were all surrounding the holding cell, as it is in line with policy for medical treatment to be provided for under such circumstances. Ultimately, Davis' continued resistive combative conduct and refusal  to adhere to clearly given Officer instructions by Harper resulted in 3 drive stun tases lasting a short duration of time 2-3 seconds all separated by intervals of time within which Davis was given to cease resistance and comply with Officer commands. Eventually, an officer who had not participated in the arrest or handling of Davis was able to successfully intervene and get Davis in a calmer state thereby allowing for Harper to be able to safely exist the cage and allow the medical personnel to attend . All witnesses whether other police officers or EMT personnel on the scene all agreed that Davis was hostile and that he was in fact resisting Officer Harper despite Harper's verbal commands and warnings to cease resisting as evidenced by all statements given whether in the IA investigation and/or in the subsequent criminal investigation.

**GEORGE DAVIS FACTS**

17.)  On November 20, 2012, George Davis was dangerous, unpredictable and potentially life threatening to those who in the line of duty had to come into contact with in, such as Petitioner herein due to threat of AIDS virus

18.) George Davis was known to be aggressive to Officers..

7

19.) George Davis has multiple previous convictions prior to the incident of November 20, 2012.

20.) George Davis was convicted in the 22nd JDC for theft, simple battery and aggravated battery on a police officer in connection with the November 20, 2012 incident.

21.) George Davis is currently incarcerated and serving a prison term for a crime he committed after the November 20, 2012 incident.

22.) A complaint was never filed by any individual and/or Davis with the City arising out of the November 20, 2012 incident. Although, Cpt. Jack West who has since resigned in connection with his involvement in an unrelated incident nevertheless told the media that "A complaint was filed in January 2013." as per the front page of the newspaper, Tammany West, Thursday March 28, 2013. [A statements given to attempt to explain why an IA investigation was just open two months later]

23.) George Davis never filed a Civil Lawsuit for Damages arising out of the incident, but rather plead guilty to his conduct in Battering an officer.

23.) The Department as a whole were all aware that the November 20, 2012, incident occurred as half of the department was present when it transpired on a shift change, and no red flags were raised as to any hint of wrong doing or otherwise.

**THE IA INVESTIGATION AND PRESS RELEASES COMMENCE**

24.) Two months after the November 20, 2012 incident, on January 18, 2013, the department suddenly opened up an IA investigation on four of its officers namely; Off. Adams [who had initially entered the cell and was bitten]; Off. Harper [Petitioner who had to go into the cage to assist Adams] Lt. Beach [Petitioner's supervisory officer who legally and justifiably ordered Davis to be tased if he resisted], and Off. William Brewster who was one of the arresting officers

responding to the initial call from the local store owner and who was thereafter present in the booking room when the incident took place.]

25.) Mayor, Mike Cooper, immediately proceeding the IA investigations being officially Launched on January 18, 2013, made voluntary press releases to the Media which he used as an opportunity to condemn as guilty Officer Adams and Petitioner, Officer Harper, as guilty of use of excessive force stating that these type of incidents will not be tolerated.

26.) Former Chief of Police, Palmisano made his own separate statements to the press.

27.) Both the Chief's and the Mayor's media statements which aired on local news channels only made mention that Adams and Harper were under IA investigation making no mention that three other Officers namely Sgt. Osbourn, Lt. Beach, and Off. Brewster were under investigation for the same incident, to be detailed further herein.

22.) Despite a complaint never having been filed, Cpt. Jack West who has since resigned in connection with his involvement / statements in an unrelated incident nevertheless told the media that "A complaint was filed in January 2013." as  per the front page of the newspaper, *Tammany West, Thursday March 28, 2013*. [A statements given to attempt to explain why an IA investigation was just open two months later] Further, the statements given by the Department after the arrest on March 28, 2013, only says that they used excessive force constructively implying guilt despite the fact that they were well aware of much evidence, facts, and witness statements that completely show otherwise.

**FORMER CHIEF & MAYOR AT ODDS**

28.) Chief Palmisano and Mayor Mike Cooper had been at odds since Cooper took office in 2011 and vowed to terminate Palmisano, although was precluded from doing so as Palmisano claimed

he was covered by Civil Service Laws.

29.) After Mayor Cooper took office a number of federal lawsuits were instituted/existed against the city with allegations of lack of supervision and training and a previous claim of excessive force by police officers under Palmisano's tenure.

30.) Mayor Cooper was outspoken that Palmisano needed to go, and they became at odds when Palmisano refused to step down. Prior to the November 20, 2012 incident there in fact occurred other incidents; incidents that formed the basis of several lawsuits against the City all filed in this Honorable Federal Court; all incidents which it is believed the City settled; all of which apparently did not add up collectively to just cause to terminate Palmisano, but the City through approval by the City Council in meetings that went into closed from public session settled the outstanding lawsuit in majority.

33.) Palmisano was still employed after these suits settled

34.) The City by settling the suits and making the settlement details confidential avoids any admission of liability and potential greater damages.

36.) Mayor Cooper thereafter fired Palmisano in connection with the November 20, 2012 incident.

38.) Mayor Cooper immediately made media statements that made it clear the Officers were guilty and that they would be dealt with.

33.) Mayor Cooper did not personally watch all of the video and audio footage before making such statements, and  Mayor Cooper's public statements were not based on the evidence.

39.) Prior to the IA being formally opened on January 18, 2013, Lt. Short, Cpt. West, Palmisano and Julian Rodriguez [the attorney for the City of Covington] met in a private meeting on

January 16, 2013, to review the video.

40.) Upon reviewing the video, City Attorney, Julian Rodriguez, advised that he would go and directly consult with the District Attorney's office in connection with this matter.

41.) The next day January 18, 2013, the IA investigation was officially opened.

42.) A criminal investigation was also thereafter shortly undertaken by the Covington Police

43.) Harper and Adams were publicly arrested on March 25, 2013, for the misdemeanor charge of Simple Battery, and the felony Charge of Malfeasance in Office.

44.) Palmisano was then terminated by the Mayor in April 2013.

45.) The District Attorney's Office prosecuted and obtained a conviction through Davis entering a plea for the November 20, 2012 incident wherein he assaulted the store owner and committed an aggravated battery on Adams.

46.) The District Attorney's Office was in possession of the necessary evidence upon which the facts of the conviction of Davis were based.

47.) The Public Defender assigned to Davis did not raise the defense of self defense as to his conduct on November 20, 2012.

48.) The District Attorney's Office in connection with David's conviction arising out of the November 20, 2012 incident never investigated or questioned the Actions of Adams or Harper taken in the line of duty in obtaining their conviction of Davis for his criminal conduct on that day.

49.) The District Attorney's Office later did initiate a prosecution against Adams and Harper through a grand jury proceeding veiled in secrecy seeking indictment, and presumably presented evidence relied upon the evidence provided or not provided by the Covington Investigative

Officers, namely Lt. Short and Det. Cullotta.

50.) The grand jury was shown video footage of the November 20, 2013 incident without any audio or sound.

51.) The booking room video footage when viewed is poor quality/grainy and it is also from a distance as it is mounted high up on the wall. The booking room footage also has clear audio.

52.) The additional taser video footage also has excellent audio.

54.) The booking room video if showed without any audio considering its poor quality makes it difficulty to make any meritful determination exactly what is transpiring.

56.) The grand jury was not presented with any of the eye witnesses testimony to Petitioner's knowledge who were directly involved in and/or witnessed the event, including Lt. Beach, Sgt. Osbourn, Pt. Williams, Leslie Blanchard, Det. Crawford and/or the two EMT/Fire fighter medical personnel all of whom gave statements that Davis was combative/resistive and that they could not say Harper acted unreasonably under the circumstances.

57.) The record when reviewed as a whole reveals that the written, and/or recorded statements of the eyewitness to the incident as listed above corroborate the same fact that Davis was combative/aggressive and did actively resist.

58.) Lt. Short and Det. Oweny gave testimony to the grand jury. Neither one witnessed the event, although they were the two who conducted the investigations in this matter.

59.) Neither, Palmisano, Lt. Short and/or Det. Culotte who were respectively calling the shots in the underlying investigation are taser certified and thus are not qualified to operate, carry, or use a taser.

60.) Also, the statements made to the media by the Mayor and the Chief both indicated that

Harper and Adams were under investigation for excessive use of force although just several days earlier as reported by Lt. Short as reported in his Summary IA Report dated March 11, 2013, Lt. Short after initially watching the video footage before undertaking any IA interviews concluded that all four Officers who were placed under IA investigation were so placed under it due to his contrived suggestion that the four officers incident reports and forms turned in versus video footage had significant inconsistency which he stated may suggest criminal liability. This went nowhere as it is not the case.

61.) Lt. Short tainted the IA investigation through intimidation tactics and overt suggestion to the department officers of what he wanted them to see in the video

62.) Petitioner requested in the criminal matter through subpoena all records and statements obtained in the IA investigation although unbelievably the only item provided was Lt. Short's  IA Summary Report which is Lt. Short's words written by his hand. This is despite the fact that the actual witness statements were recorded, they were not provided.

64.)   Thus, Defendant was given a hearsay document drafted by Lt. Short which contained his summary of how the IA interviews transpired and not the actual witness statements taken which were recorded; apparently no one was given the benefits of the numerous first hand account witness statements taken in the IA,not the DA's office, not the grand jury, not the Defendant after indictment and apparently not even the Court in the City's production to the court of all IA materials for In Camera inspection. Certainly the DA's Office if they had been in possession of or reviewed such IA interviews and/or the Court through the in camera inspection would have found a number of IA statements given by various witness to have been not only relevant but favorable to defendant and his defense and certainly would go to credibility of certain actors and

ultimately as to the investigations themselves. Certainly, all of this did not just go unnoticed.

65.) Petitioner's Counsel and petitioner spoke to witnessed interviewed in the IA who in fact all have favorable or exculpatory statements to petitioner's defense.

67.) Some of these witnesses agreed to provide statements per affidavit as to the actions taken in the Investigation and as to what they witnessed with the witnesses having in depth conversations with counsel for petitioner.

68.) The last response Counsel for Petitioner got was a confirmation in writing that the affidavit was approved to be signed on Friday the 23rd of May 2014. Thereafter, no phone calls were returned, or messages responded to with Petitioner learning that the witnesses were approached by department officials and where all of a sudden no longer so inclined out of clear concern over retaliation.

65.) The manner in which Lt. Short conducted the IA interviews was an outright attempt to taint them. One witness would have stated Short, "tailored the investigation with an end result in mind." through various mechanisms including the use of duress, threats, and intimidation including approaching officers prior to their formal IA interview to conduct an informal mini IA which opportunity Lt. Short took to make suggestions to the witness regarding what they saw or didn't see and essentially "plant the seed" as detailed below herein. Petitioner can see why only the Summary of the IA interviews drafted by Short was produced as opposed to the actual witness statements.

66.) The understanding and consensus among officers in the department concerning the internal affairs investigation, conducted by former IA Lt. Short, and the subsequent criminal investigation and arrest of Officer Harper by former Detective, Steven Cullotta was that such

was being undertaken, orchestrated and pursued for politically motivated reasons on behalf of former Chief Palmisano with both Short and Cullotta making attempts to tailoring the investigation with an end result predetermined.  It was known not only within the department but publicly via media coverage of the ensuing ongoing political battle between former Chief Palmisano and the Mayor who wanted to replace Palmisano as chief of police. Witnesses spoken to agreed this was the case and had agreed to attest to such in writing before being warned by the department not to associate with Petitioner and/or or informed of the Departments position.

63.) There exists text messages and emails supporting the communications with the witnesses who went silent within a 24 hr period to no fault of their own as due to a real perceived threat to livelihood or other repercussions within the department.

67.) Factual examples as to either the game plan of those in charge and/or specifically as to the corroborating fact of how Lt. Short or Cullotta conducted their respective investigation are more fully detailed as contained in Petitioners Affidavit and **EXHIBIT**- Affidavit of Counsel and as shown in part herein below

> a.)  Officers Spinks, Blackwell, Culotta, and Short attempted to circulate the rumor that Beach told me to "Let" Davis up not "Light" Davis up if he stood up again
>
> b.) That I was bluntly told that *depending on what I say when Culotta, Owenby, and Short interview me depends on if they are going to charge me criminally or not*."
>
> c.)  That the video footage shown to the Grand Jury did not include any audio.
>
> d.) That Lieutenant Beach was left out of the Discovery provided by the Da's office. That this was intentionally done because the detectives and Palmisano did not like what Beach had to say. That they wanted the case to sway a certain way and would do whatever it took it make it happen.
>
> f.) I was informed  *that the criminal investigation never even started until after we were arrested.* and that "they  Palmisano, Short, West, Culotta  started getting very worried when they could not locate George Davis anywhere due to the fact "they knew what it would look like if they could not find him and get statements from him."

15

g.)That Palmisano, West, Culotta, and Short's plan was that they could just ram this thing on into the 22nd JDC and everything would go the way they wanted but that when I and Adams plead not guilty and did not buckle under the pressure of receiving    the Maximum punishment from the ADA working the case it pissed a lot of people off." as. . . "they thought you guys would just go away."

h.)That it was Det. Cullotta's job to try and get close to me with the same officer informing he was witness to Short, Cullotta, Palmisano, Blackwell and Spinks intentionally attempting to alter what happened through Lt. Beach who rightfully refused to go along with their agenda.

68.) Also, in addition to the grainy  video of the incident being presented without any audio Key eyewitness with exculpatory testimony were not presented to the grand jury either live and/or through per-recorded statements in the possession of the Police Department including that of Lt. Beach or Sgt. David Osborne but  only that testimony of the individuals who investigated the matter namely Lt. Short and Det. Cullotta. There was no eyewitness testimony presented despite the fact that there existed multiple eye witness testimony and which statements were taken in the criminal investigation except for that of Lt. Beach who was only interviewed in connection with and after being put under IA investigation. The other individuals involved in the incident and put under IA including Lt. Beach, Sgt. Osborne, Off. Will Brewster, Off. Adams were not subpoenaed and nor were their statements presented. Also, other individuals with direct involvement such as Leslie Blanchard, and the two EMT personnel who are firefighters and witnessed the event and provided statements were not presented.

69.) Of Grave concern and irreparable harm Petitioner avers that five defense witnesses who are still employed as Officers with the Covington PD have suddenly been silenced in the last week through efforts within the department. These Officers who were Defense and state witnesses had been recently speaking freely to my counsel, Christine Voelkel, concerning a multitude of facts

regarding the bad faith criminal prosecution of Petitioner in this matter as non-exclusively stated herein above as well as in Petitioner's Affidavit.

70.) The officers all wanted justice and truth and to expose the nature of the truth behind the prosecution of Harper and had agreed to execute affidavits of fact under oath concerning the bad faith prosecution by certain Officer's within the department some of whom they had personally witnessed committing in order to carry out the politically motivated agenda through the instant criminal prosecution.  Only one officer of the five who after communicating directly with Petitioner regarding matters stated  that he couldn't take the risk of retaliation or losing his job in order to commit to testify in my defense. The other four Officers all had agreed execute an affidavit as to their knowledge in matter, but suddenly cut off the lines of communication due to the overriding concern of retaliation or being labeled and how they will be received by the department if in fact they voluntarily associate further with Petitioner's case .

72.) One Officer stated he was recently pulled into the Chief's office and was effectively told in referring to the November 20, 2012 incident that "y'all should not have done that" making it clear to the Officer what the department's position was going to be prior to the upcoming trial.

73.) Another Officer stated that he was also approached by one of the Chief's Officer's, who asked if he had been communicating with me and proceeded to basically state that he should not be associated with me or other officers such as Mayberry, Northcutt, and Adams; Officers who all at one point or another had taken a stand against the activities of the Department.

74.) Additionally, Officers would have attested that Lt. Short "tailored the investigation with an end result in mind" and that the investigation was "botched" and or tainted through Lt. Short's

pre-IA investigations attempts to pre-plant a version of events that in reality based on eyewitness officer testimony did not occur.

75.) Witnesses all agreed that the general understanding and consensus among officers in the department concerning the manner in which internal affairs investigation, conducted by former IA Lt. Short, and the subsequent criminal investigation and arrest of Officer Harper by former Detective, Steven Cullotta was that they were being handled, orchestrated and pursued in a bad faith manner for politically motivated reasons on behalf of former Chief Palmisano with both Short and Cullotta seemingly tailoring their respective investigations to fit a per-determined end result. It was known not only within the department but publicly via abundant media coverage of the ensuing political battle between former Chief Palmisano and the Mayor who wanted to replace Palmisano as chief of police and was looking for an opportunity to do so..

77.) Further, witnesses would attest to the intent that Officer Adams was the target of the IA investigation, and that it likewise became known within the department that if Officer Harper didn't play ball by going along with how actors Short, Cullotta, and Palmisano wanted it handled and/or portrayed that he Officer Harper would be targeted due to the fact that he would not play ball and make the statements that they wanted to see to.

78.) Also, one of the cops would have stated that he was placed frivolously under IA investigation by Lt. Steven Short despite his complete lack of direct participation in the incident between the officer's and Davis. He stated in detail that at the commencement of the IA investigation, Lt. Short says let me show you some video.  He proceeds to pull up an extremely brief 45 second clip of the of the incident that gave rise to Officer Harper having to enter the

cage to assist Officer Adams. Lt. Short played the the brief clip which showed Officer Adams in

the cage with Davis. Lt. Short then stated to the effect of....you did see him hit him.....(wherein

he was suggesting to me that that Officer Adams had hit Davis). Lt. Short apparently not

satisfied that with the fact that his suggestion was not what the Officer saw insisted on playing

the approximately 45 second clip a second and a third time and with each time attempted to

convince him, and suggest to him of what Short wanted to see. Still not satisfied despite

replaying the clip several times, Lt. Short then played the clip in slow motion for  him which still

did not change the fact that he could not honestly or in a truthful manner agree to his

suggestiveness and just say  or agree with what he wanted. He indicated that after Lt. Short

played the clip for the last time in slow motion that he still did not agree with his suggested

version of events, with Short then proceeding to actually state: "O.K. lets get this on the record."

indicating he was not comfortable with Lt. Short's underhanded handling of my IA investigation

and that it became clear to him that he was selectively tailoring the IA investigation into Officers

Adams and Harper in disregard for the law and the Officer's Bill of Rights by intentionally

ignoring and disregarding statements given which were not in line with either the IA and/or

criminal investigation' ultimate agenda. As Short did not record this officer's statement given

when he saw he could not flip the witness and nor did he ever mention that he was interview,

there is no mention of this witness anywhere. Had Counsel not discovered him on her own and

communicated with him it would not have come to light, although this witness too is now in

concern over retaliation, discipline, and his job.

80.) One Officer expressed that would have testified as confirmed in writing that he was placed

under an IA investigation for improper purposes by Lt. Short and felt the pressure tactics utilized

in order to have some leverage insofar as to whether my statements as a direct witness having

first hand knowledge of the incident would or wouldn't further the end result they wanted.  He

stated that Harper did not do anything wrong being and was able to give a 1st hand account of

the incident but stated that  "they did not like what I had to say. He noted that he though it was

odd he was not interviewed in the criminal investigation by Cullotta. or that he was never

subpoenaed to appear and testify before the grand jury proceedings despite having 1st hand

knowledge of the event by witnessing the majority of it and taking appropriate action under the

circumstances as they developed.

81.) Another Officer was not called in front of the grand jury would have testified as to Short's

threatening, during the IA interview wherein he attempted to silence his Attorney (Also

Petitioner), and preclude her from speaking and/or making any statements on the record and

during the course of the IA interview despite the fact that such is specifically allowed for in the

black letter law as contained in the Police Officer's Bill of Right's  found in the Louisiana

Revised Statutes. Lt. Short threatened Both the Officer and his Counsel for the last couple of

minutes before the interview ended, attempting to violates that witnesses right to counsel and

became seriously irrationally threatening and stated he would have officers remove counsel if

she spoke and informed Sgt. Osborne that he would have to get" a new one" and who ultimately

left the room to have her removed which is detailed in the transcript of Sgt. Osborne IA

interview as contained in my counsel's affidavit, and attached hereto as although it was never

provided and/or turned over and Lt. Short in his Summary Report , ie the only IA item turned

over classified it as follows: "After a brief misunderstanding with Counsel, the interview was

terminated" A reading of the transcribed tape shows otherwise

82.) Also, the same Officer whose right to counsel was threatened during Petitioner's IA investigation would also testify that he was also approached prior to being informed that he would be put under investigation and informed by Lt. Steven Short that he had done a good job, but was nonetheless being put under an IA investigation in attempt to place pressure on the officer as to how they wanted this matter to go.

83.) In addition to the above facts not only were Petitioner's federal constitutional rights usurped but Defense and State witnesses have been interfered with to in numerous unacceptable manners which begs for these State actors to be enjoined from continuing forward with bad faith prosecution in the underlying criminal matter. There exist multiple bad faith acts warranting federal intervention occurring both in the IA investigation and in the criminal investigation in addition to the fact that recently state and defense witnesses have been silenced due to fear of retaliation, fear of losing their job etc..

84.) Defense and State witnesses in this matter as evidenced by the attached affidavit have been effectively silenced through intimidation, and coercion by actors of the Police Department with such witnesses free speech and desire to tell the truth regarding the impermissible motive underlying the criminal prosecution of Petitioner being chilled through the actions of public officials with the witnesses expressing serious concern of retaliation or prosecution which conduct violates Petitioner's constitutional rights to due process and free speech.

      **WHEREFORE**, Petitioner avers and prays that an immediate emergency temporary restraining order should issue as (1) Petitioner has more than substantial likelihood of success on the merits for a preliminary injunction to be sustained; (2) and there also exist a substantial threat that failure to grant the injunction will result in a irreparable injury to petitioner due to the bad

faith prosecution by the officers and officials involved and the recent silencing of witnesses who are in fear of retaliation and this is an irreparable injury of the worst kind when truth, justice, and the system itself and the ability to testify truthfully are at stake not to mention the investigations themselves and ultimate taint of evidence or failure to present evidence to the grand jury being in bad faith as well as the fact; (3) that the direct injury outweighs any potential damage that the injunction may cause the opposing party; and (4)  that the injunction will not to diserve the public interest, rather quite the opposite. Petitioner avers that a hearing should be set so that witnesses can be formally subpoenaed as to the contents herein

Respectfully Submitted

/s/ Christine Y. Voelkel

_____
CHRISTINE Y. VOELKEL (#29469)
218 Lafitte Street
Mandeville, La 70448
(985) 869-1337-Telephone
Attorney for Nicholas A. Harper

## CERTIFICATION

I hereby certify that the above petition for Injunction has been either served via the Court's electronic filing system and/or served pursuant to Local Court and/or the federal rules of Civil Procedure.

## VERIFICATION AND CERTIFICATION OF NOTICE TO OPPOSING PARTIES BY COUNSEL

Undersigned avers and certifies that she gave the opposing parties of her intent to file the instant Injunction On Friday May 31st, 2014 via Correspondence and likewise informed that she would also provide notice at the actual time of filing which was intended for Friday afternoon, but which was unable to be completed due to undersigned's network being down which caused delay in additional to the recent development regarding the witnesses fear of retaliation that had to be addressed forthright. Undersigned was able to confirm the delay via email with one of the Defendants who responded to her letter requesting email addresses to provide defendants copy's of the instant application once it was completed. Undersigned shall likewise provide a copy when filed.

/s/ Christine Y. Voelkel

_____

23

**EXHIBIT'S FILED:**

**EXHIBIT-E-Petitioner Affidavit**

**EXHIBIT'S TO BE FILED: IN Preperation:**

**(EXHIBIT "A"**In Globo- November 20, 2012 Police Reports of Lt. Beach, Off. Harper, Off. Adams, and Off. William Brewster)

**(EXHIBIT B -**Video Footage from the Booking Room of November 20, 2012 incident-NOTE: this will be separately provided to the court's record should this type of media evidence not be able to be filed through the court's EFC electronic filing system)

**(EXHIBIT C-**-Taser video footage of November 20, 2012 incident <u>NOTE</u>: this will be separately provided to the court's record should this type of media evidence not be able to be filed through the court's EFC electronic filing system)

**(EXHIBIT D-** Photographs of George Davis taken after the incident)

**(EXHIBIT -E** Petitioner, Nicholas A. Harper's Affidavit)

**(EXHIBIT F-**Fire Fighter / EMT report statements)

**(EXHIBIT G-**WITNESS COMMUNICATIONS/confirmations and prepared Affidavits)

**(EXHIBIT H-**Criminal Investigation Report)

**(EXHIBIT I-**Warrents)

**(EXHIBIT -J-**Lt. Short IA interview of David Osbourn-AUDIO)

**(EXHIBIT L-**Media Statements)

**(EXHIBIT M-** Transcript of Osbourn IA by Lt. Short)

**(EXHIBIT N-**Pacer Lawsuit Records)

**(EXHIBIT O-**Affidavit of Counsel)